UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KATHERINA SWANK, | ) | CASE NO. 1:13CV2048 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | |
| CARESOURCE MANAGEMENT GROUP CO., | ) | **ORDER AND DECISION** |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on a motion for summary judgment filed by Defendant CareSource Management Group Co. ("CareSource"). Doc. 25. The Court finds that no genuine disputes of material fact exist as to Plaintiff Katherina Swank's claims of disability discrimination and retaliation. As such, for the following reasons, CareSource is entitled to judgment as a matter of law, and its motion for summary judgment is GRANTED.

I. FACTS AND PROCEDURAL HISTORY

This case arises out of Swank's employment termination. The parties do not dispute the underlying facts:

Swank is a Registered Nurse ("RN") and was hired by CareSource in 2007 as a Case Manager in the Warrensville Heights office. Doc. 24-1 at 26, 47. CareSource is a managed healthcare organization that manages Medicaid recipients. Doc. 24-1 at 43-44. As a Case Manager, Swank worked with members and healthcare providers to conduct healthcare assessments and to assist in member management. Doc. 24-1 at 43-46.

1

Between late 2008 and early 2009, Swank was diagnosed with rheumatoid arthritis. Doc. 24-1 at 29-36, 117-118, 124-131. She experienced intermittent difficulty with walking and lifting heavy items. Doc. 24-1 at 40. She also became more susceptible to illness due to a weakened immune system. Doc. 24-1 at 41-42. In March of 2009 Swank sought a medical accommodation so that she could work at home. Doc. 24-1 at 134-141; 24-2 at 11. This accommodation was denied due to information gathered from her physician. Doc. 24-1 at 141-144; 24-2 at 12. Instead, CareSource offered Swank a Case Manager Teleworker position, which she accepted. Doc. 24-1 at 117-119.

In spring of 2011, CareSource entered into discussions with the Ohio Department of Jobs and Family Services ("ODJFS") to explore a new approach to delivery of managed care services. CareSource was under contract with ODJFS servicing Medicaid recipients. Doc. 24-3 at 18. ODJFS mandated that CareSource restructure their health plans so that it followed a high touch, community-based model. Doc. 24-1 at 52; Doc. 24-3 at 18. While the Case Manager position was previously completed via telephone, ODJFS now required Case Managers to meet face-to-face with certain patients on a quarterly basis. Doc. 24-1 at 52; Doc. 24-3 at 18.

In response to this mandate, CareSource eliminated the Case Manager position and created the High Risk Case Manager ("CMHR") position to meet the needs of its patients. Each CMHR was assigned to oversee a team consisting of a Licensed Practical Nurse ("LPN"), a social worker, and a patient navigator. Doc. 24-3 at 20-21. The CMHR was an registered nurse who served as the accountable point of contact for the CareSource member and was ultimately responsible for coordinating the appropriate care treatment plan for the member. Doc. 24-3 at 22-24. Driving was not listed under "Essential Functions" on the job description, but was listed on

the job description under "Work Environment/Physical Requirements". Doc. 24-2 at PageID #: 292

Swank was offered the CMHR position in November of 2011. Doc. 24-1 at 62-64. She raised concerns that the driving portion of the position would be an issue due to her rheumatoid arthritis. Doc. 24-1 at 63-64. She then sent a letter to Pam Tropiano, the Vice President of Health Services, stating that the CMHR position "would be hazardous considering [her] current health condition." Doc. 24-1 at 155-156; 24-2 at 15.

In December of 2011 Swank met with her supervisors and was offered the contract for the CMHR position. Doc. 24-1 at 60, 161-162. She again expressed concern about the driving portion of the job. Doc. 24-1 at 72. Her supervisors suggested that Swank make a formal request for accommodation and informed her that CareSource would temporarily waive the driving requirements of the CMHR position pending review of Swank's limitations and any possible accommodations. Doc. 24-1 at 73, 162. Driving was not necessary during this temporary transition period to the new model, which is why CareSource allowed Swank this temporary accommodation. Doc. 24-1 at 73. Swank was told that any other available positions were in Dayton and would only be given to employees in the Dayton office. Doc. 24-3 at 47.

Swank completed an accommodation request, stating: "Unable to tolerate being exposed to changes in weather conditions. Unable to sit/stand for long periods of time." Doc. 24-2. Her doctor noted that she would experience "difficulty" performing her tasks and duties identified in the job description. Doc. 24-2. No accommodations were listed in this request form by either Swank or her physician. Doc. 24-2.

3

In May of 2012, Swank answered "No." to her supervisors when asked if she was able to perform her job duties with or without an accommodation. Doc. 24-1 at 221. Swank was then terminated on May 21, 2012. Doc. 24-1 at 221.

## II. LEGAL STANDARD OF REVIEW

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is material if it is one that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary burdens. *Id.* At 252. Further, on summary judgment, the inferences to be drawn from underlying facts must be viewed "in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The pivotal question in deciding a motion for summary judgment is whether a reasonable fact finder *could* make a finding in favor of either party. *See Anderson* 477 U.S. at 250 ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.").

The initial burden of showing the absence of any "genuine issue" belongs to the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury" or other fact-finder at trial. *Cox v. Kentucky Dep't of Transp.*, 53 F.3d

146, 150 (6th Cir. 1995). A party opposing summary judgment must show that there are facts genuinely in dispute, and must do so by citing to the record. Fed.R.Civ.P. 56(c)(1)(a).

### III. LEGAL ANALYSIS

#### A. Disability Discrimination

Where a plaintiff has direct evidence that the employer relied on his or her disability in making an adverse employment decision, or if the employer admits reliance on the handicap:

> 1) the plaintiff bears the burden of establishing that she is "disabled";
>
> 2) the plaintiff bears the burden of establishing that she is "otherwise qualified" for the position despite her disability:
>
>> a) without accommodation from the employer;
>>
>> b) with an alleged "essential" job requirement eliminated; or
>>
>> c) with a proposed reasonable accommodation.

*Horn v. Knight Facilities Management-GM, Inc.*, 558 Fed.Appx. 452, 455 (6th Cir. 2014). If the plaintiff carries her burden, the defendant then bears the burden of proving that "'a challenged job criterion is essential, and therefore a business necessity,' or that a proposed accommodation would impose an undue hardship on its business." *Id.*, citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868-69 (6th Cir. 2007). The ADA defines "undue hardship" as:

> An action requiring significant difficulty or expense, when considered in light of:
>
> (i) the nature and cost of the accommodation needed under this chapter;
>
> (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

5


146, 150 (6th Cir. 1995). A party opposing summary judgment must show that there are facts genuinely in dispute, and must do so by citing to the record. Fed.R.Civ.P. 56(c)(1)(a).

### III. LEGAL ANALYSIS

#### A. Disability Discrimination

Where a plaintiff has direct evidence that the employer relied on his or her disability in making an adverse employment decision, or if the employer admits reliance on the handicap:

> 1) the plaintiff bears the burden of establishing that she is "disabled";
>
> 2) the plaintiff bears the burden of establishing that she is "otherwise qualified" for the position despite her disability:
>
>> a) without accommodation from the employer;
>>
>> b) with an alleged "essential" job requirement eliminated; or
>>
>> c) with a proposed reasonable accommodation.

*Horn v. Knight Facilities Management-GM, Inc.*, 558 Fed.Appx. 452, 455 (6th Cir. 2014). If the plaintiff carries her burden, the defendant then bears the burden of proving that "'a challenged job criterion is essential, and therefore a business necessity,' or that a proposed accommodation would impose an undue hardship on its business." *Id.*, citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868-69 (6th Cir. 2007). The ADA defines "undue hardship" as:

> An action requiring significant difficulty or expense, when considered in light of:
>
> (i) the nature and cost of the accommodation needed under this chapter;
>
> (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

5

> (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
>
> (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C.A. § 12111(10)(B)(i)-(iv).

Here, the parties have argued their positions assuming that Swank is "disabled" under the *Horn* analysis. The Court will do the same. As such, the Court considers whether Swank has met her burden of establishing that she is "otherwise qualified" for the position without accommodation from the employer, with an alleged "essential" job requirement eliminated, or with a proposed reasonable accommodation. The Court finds that Swank has failed to sustain her burden, and CareSource is entitled to judgment as a matter of law on all claims.

### 1. **Performing as a CMHR without an accommodation.**

In her brief in opposition to summary judgment, Swank argues that she could have performed as a CMHR without an accommodation, acknowledging that her physician said she would have "difficulty" performing her job functions "but did not suggest that she needed any accommodations and thus could perform her job duties without accommodation." Doc. 32-1 at 14. However, this argument is disingenuous and unsupported by the undisputed facts in this case. Just two sentences after Swank asserts that she could perform the job without an accommodation, Swank argues that "any concern about driving could be remedied by assigning Swank members close to her home…," which is one of the very accommodations that she requested from CareSource.

In fact, this litigation was instituted because Swank argues that CareSource unlawfully terminated her employment when she could have performed her job duties with reasonable accommodation. She even submitted a request for accommodation from CareSource, arguing that she need an accommodation in order to perform her job as a CMHR. Furthermore, apart from the three sentences suggesting that she could perform the CMHR position without accommodation, the remainder of the 21-page brief is devoted to arguing that Swank was disabled but could have performed the job with an accommodation, and therefore, her termination was unlawful.

Given this, no genuine dispute of material fact exists, and Swank cannot sustain her burden of proof on this element.

**2. Driving as an essential function of the job.**

Swank next argues that driving was not an essential function of the job. "A job function is essential if its removal would 'fundamentally alter' the position." *Kiphart v. Saturn Corp.,* 251 F.3d 573, 584 (6th Cir. 2001). Driving was not listed under "Essential Functions" category of the CMHR job description, but it was included within the "Work Environment / Physical Requirements" section of the job description.

> **Work Environment/Physical Requirements:**
>
> 1. Mobile Worker: Will work at different office locations established by CareSource and will typically work in established geographical area in the community; will be exposed to weather conditions typical of the location and may be required to stand and/or sit for long periods of time.
>
> 2. Perform reasonable travel related duties including member home visits, provider visits, and community based visits as needed to ensure administration of the program.

Doc. 24-2 at PageID #: 292 (emphasis in text).

7

The CareSource contract with ODJFS mandated an in-touch, community-based model, which would include quarterly visits by the CMHR with members.[1] While other employees could make face-to-face visits, there were some visits that only registered nurses could make, and the only registered nurses on the team were CMHRs. In fact, Swank herself understood that driving was an essential function of the job:

> Q. **You understood that it would be a requirement that you as the high risk case manager would have to perform at least some of these in-house, these in-person visits, right?**
>
> A. **Correct.**
>
> Q. What was the purpose of the in-person visits, do you know/
>
> A. Just to check to make sure that the patient had everything that they needed, that they were safe, in a safe environment, that they had a roof over their head. **Sometimes it's hard to assess a patient without actually seeing them, if there's issues.**
>
> Q. If it was your understanding that you could assign the in-person visits to a navigator…or a social worker, why was it that you were concerned about the driving associated with this position?
>
> A. **Because sometimes an RN would need to go out to see a patient.**
>
> Q. **So you knew then that you were going to have to make some of those drives?**
>
> A. **Correct.**

---

[1]
Q. Can you describe for me the transition going from case manager to high risk case manager?
A: Well, they restricted the job responsibilities.
Q: Do you know why?
A: A little understanding.
Q: Okay. What was your understanding?
A: That we just needed to change the ways that we were doing things.
Q: In what way?
A: All of a sudden the nurses had to become, I guess all of them were going to be telephonic. They were going to be working at home but they were still going to have to be mobile.

Doc. 24-148

8

Doc. 24-1 at 58-59 (emphasis added); see also Doc. 24-1at 166-167.

> Q. Did you have any understanding as to what percentage of the job description required that the high risk case manager be mobile and just so we are clear, by mobile we mean traveling to see the patients at their homes?
>
> A. **They determined that it might, could have been up to 50 percent of the time.**

Doc. 24-1 at 52 (emphasis added).

As admitted by Swank, driving was indeed an "essential function" as defined by *Kiphart*. In fact, Swank acknowledged that the very reason for the re-structuring is that the contract with ODJFS required a CMHR to be mobile and perform face-to-fact visits. Doc. 24-1at 50 (Q. So it's your understanding that the structural changes in CareSource were being driven by ODJFS, correct? A. Correct).

Swank's attempt to conflate the legal requirements of an "essential job function" with a lay company's use of the heading "Essential Function," ignores: 1) the remainder of the requirements outlined on the job description; and 2) the very substance of Swank's argument that she needed an accommodation because driving and mobility were required and "essential" by the CMHR position.

Given this, there is no genuine issue of fact that driving is an essential function of the CMHR position. Swank cannot sustain her burden of proof on this element.

### 3. **Proposed accommodations.**

Swank next argues that CareSource discriminated against her because it did not grant her accommodation request. Swank now argues that CareSource could have required other employees and registered nurses to take over her driving responsibilities as an accommodation.

9

However, CareSource was not required to assign other employees to assume her duties. An employer is "not required to assign existing employees or hire new employees to perform" an employee's essential job functions. *Bratten v. SSI Services, Inc.,* 185 F.3d 625 (6th Cir. 1999). "Elimination of essential job functions is not required as a form of reasonable accommodation." *Dabney v. Ohio Dep't of Admin. Servs.,* 18 Am. Disabilities Cas. (BNA) 54 (S.D. Ohio 2006).

Furthermore, an employee claiming that she could have performed a job with an accommodation "has the initial burden or having proposed an accommodation and showing that the accommodation is objectively reasonable**…[A] plaintiff may not rely on accommodations that he did not request.**" *Manigan v. Southwest Ohio Reg'l Transit Auth.,* 385 Fed. Appx. 472, 478, n.5 (6th Cir. 2010) (emphasis added); *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996), *abrogated on other grounds*, ("[T]he disabled individual bears the initial burden of proposing an accommodation and showing that *that* accommodation is objectively reasonable." (emphasis in text)). In her accommodation request, Swank did not identify what specific accommodation she sought. In conversations with supervisors, Swank discussed being assigned members who were close to her home so that her driving would be limited. She never articulated this in her actual request for accommodation.

Even assuming that CareSource had an obligation to suggest an accommodation and assign her members living close to her home, this would still require her to drive and spend considerable time sitting still. As such, Swank admits that there was no accommodation that CareSource could have provided to address her difficulty driving:

> Q. And you understood that [being assigned] patients closer to home didn't necessarily mean you wouldn't be required to sit or stand for long periods of time, right?
> A. Correct.

> Q. Because you might be driving in traffic, you could be in the car for a long period of time even if the patients were closer to [your] home, right?
> A. Yes.
> Q. And there was nothing anybody could do to keep you from experiencing changes in the weather, right?
> A. Right.
> Q. And one of the things you told CareSource was that you were unable to tolerate being exposed to changes in the weather, right?
> A. Correct.
> Q. **So there was really no accommodation for that, was there?**
> A. **No.**

Doc. 24-1 At 175:16-176:21 (emphasis added).

Given this, Swank did not meet her obligation to suggest a specific accommodation at the time she submitted her request for accommodation. Even if she had suggested a specific accommodation (including assignment of patients near her home), her own testimony establishes that there was no accommodation that CareSource could have provided that would have eliminated the difficulty with driving. Instead, the only accommodation to mitigate the concerns with driving would be to assign the face-to-face visits to another employee, which as demonstrated above, would have fundamentally altered the purpose of re-structuring and voided the ODJFS mandate for registered nurses (i.e., CMHRs) to meet with the patients. The law does not require CareSource to have altered the position, hired others to perform this portion of the job, or assign existing employees to perform this essential function of the CMHR position.

### 4. Other CareSource Positions.

Swank's final argument is that she was discriminated against because she was not offered a position at other CareSource offices. Other positions also required significant travel and in-person visits with members and/or healthcare providers. Doc. 24-5 at 17-18, 37-39; Doc. 24-3 at

11

40-41. The only other open telephonic positions were located at an office in Dayton. Swank was told this. Doc. 24-1 at 163. She then indicated that she was not willing to relocate.

> Q. Did you yourself look to see if there were job vacancies that Katy Swank could perform?
>
> A. Yes.
>
> Q. All right. What did you do to look for job vacancies?
>
> A. […] I discussed different roles and responsibilities with clinical staff that might be vacate, let me know if this position is vacate. Unfortunately, due to the geographical location of where Katy lived, the options were very limited.
>
> Q. Did you ask Katy if she was willing to relocate?
>
> A. I did not. No, I did not ask her. I believe her leadership asked her and said, you know, if you would be interested in these roles it would require you to relocate, and it was shared with me that she was not open to relocation.

Doc. 33-1 at 54-55. Swank has made no argument or suggestion that she was willing to move to Dayton to work for CareSource or that she was able to make the long communicate between northeast Ohio and Dayton. As such, there is no genuine issue of material fact that CareSource did not engage in disability discrimination by failing to offer Swank a telephonic job in Dayton, Ohio.

### B. Retaliation

Swank argues that she was subject to retaliation for pursuing a reasonable accommodation based on her disability. Doc. 32-1. A prima facie case of retaliation has four elements: 1) the plaintiff engaged in legally protected activity; 2) the defendant knew about the plaintiff's exercise of this right; 3) the defendant then took an employment action adverse to the plaintiff; and 4) the protected activity and the adverse employment action are causally connected. *Gribcheck v. Runyon,* 245 F.3d 547, 550 (6th Cir. 2001).

Swank argues that she was treated differently than other CMHRs by not receiving certain equipment (such as a lap top and cell phone), being left out of daily training and team meetings, not having her cell phone number published on the phone list, and by her eventual termination. Doc. 32-1 at 19-20. An adverse employment action is defined as a "materially adverse change in the terms or conditions of employment." *See Kocsis v. Multi-Care Management, Inc.,* 97 F.c3d 876, 885 (6th Cir. 1996).

In determining whether an action is "materially adverse," courts consider whether the action resulted in "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* at 886. The change must be more disruptive than "a mere inconvenience or an alteration of job responsibilities." *Id.*

In looking at Swank's claims, apart from termination, she suffered no other "adverse actions." While CareSource processed Swank's request for accommodation, it temporarily relieved her of the travel obligations pending the outcome of her request. Doc. 24-1 162-63. Consequently, Swank admitted that she did not need the mobile equipment, including the laptop and cell phone, to perform the job duties she had at the time:

> Q. But you weren't working as a mobile worker at that time, you were working at home, so you didn't really need the cell phone or the laptop, did you?
> A. No, I guess not.

Doc. 24-1 at 228.

> Q. But you did have a computer at home, right?
> A. Yes.
> Q. You had a phone at home, right?
> A. Correct.

13

> Q. And you were able to perform the duties that you had during the first quarter of 2012, right?
> A. Correct.

Doc. 24-1 at 97-98.

Since Swank acknowledges that she did not need a cell phone to perform her duties at the time, she likewise would not have had a cell phone number to publish on the phone list. Further, Swank was told by a CareSource supervisor that she could participate in the training meetings but "didn't need to" attend them since she was not performing the duties of the CMHR position at that time. Doc. 24-1 at 102. The same is true with CPR training, which Swank admitted she "could have attended" but "thought why even bother" when her supervisor confirmed that she was not required to attend. Doc. 24-1 at 238.

The only remaining "adverse action" is Swank's termination; however, Swank cannot show a genuine issue of material fact as to her termination being causally connected to her request for accommodation. Rather, as discussed above, Swank's termination was not a result of <u>requesting</u> an accommodation, but a recognition that Swank was unable to perform the mobility and driving requirements, which are essential functions of the CMHR position. Therefore, Swank was not qualified for the position:

> Q. Ms. Swank, tell me about your termination from CareSource, how did you find out?
> A. They called me on the phone.
>
> \* \* \*
>
> Q. Okay. What did she say?
> A. She called me up and she just introduced herself and she told me that the other two girls were on the phone. **And then she asked me if I was able to do my job duties and responsibilities with or without an accommodation.**
> Q. What did you say?
> A. **I said no.**

Doc. 24-1 At 220-221 (emphasis added).

At deposition, Swank stated that she answered this question believing it was directed at another type of position.  However, Swank admits that, immediately after the conversation, she "didn't call anybody back and say there's been a big misunderstanding."  Doc. 24-1at 225.  Since Swank failed to correct any misunderstanding known to her, CareSource was certainly reasonable to rely on Swank's statements that she was unable to perform the job duties and responsibilities of a CMHR with or without an accommodation.

Considering the requirements of the new contract with ODJFS, the mandatory mobility and travel requirements as essential job functions, Swank's statement that she could not perform those job duties with or without a reasonable accommodation, along with the other testimony described above, no genuine issue of material fact exists as to Swank's claim for retaliation.  CareSource is entitled to judgment as a matter of law.

### C.  Interactive process claims.

In her brief in opposition, Swank raises an independent claim for failing to engage in a good faith interactive process.  Doc. 32-1 at 16.  However, Swank failed to allege this claim in her Complaint, and the Court declines to consider here.

### D.  State-law claims for discrimination and retaliation.

Swank has acknowledged that courts may generally apply federal precedent to employment discrimination claims under Ohio law.  *Jakubowski v. The Christ Hospital*, 627 F.3d 195, 201 (6th Cir. 2010) ("…analysis of claims made pursuant to the American with disabilities Act applies to claims made pursuant to Ohio Revised Code §4112.02…").  Swank has made discrimination claims under the Ohio Revised Code, but defers to the analysis of the federal claims to resolve the state-law causes of action.  Likewise the Court will do the same.  Because

15

this Court finds that no genuine issues of material fact exist as to Swank's federal claims for discrimination and retaliation, the Court also finds that no genuine disputes of material fact exist as to the state-law claims. Thus, CareSource is entitled to summary judgment on all of Swank's state-law claims.

### IV. CONCLUSION

Reviewing the facts in a light most favorable to the Plaintiff Katherina Swank, no genuine dispute of material fact exists on any claim against Defendant CareSource. Thus, a jury could only reach one conclusion – that is, CareSource did not discriminate against Swank based upon her disability. Therefore, CareSource is entitled to judgment as a matter of law, and its motion for summary judgment is GRANTED.

IT IS SO ORDERED.

Dated: 09/30/2015                      */s/John R. Adams*
                                                        JOHN R. ADAMS
                                                        UNITED STATES DISTRICT JUDGE